**REVISED DECEMBER 26, 2018**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 16-11820

United States Court of Appeals
Fifth Circuit

**FILED**
November 28, 2018

Lyle W. Cayce
Clerk

TELISA DE'ANN BLACKMAN,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, JONES, and ENGELHARDT, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Telisa Blackman, Texas prisoner # 848568, was convicted of murder in 1998 and sentenced to life imprisonment. In this successive Section 2254 application, she challenges her conviction under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173 (1959); and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972). We do not reach the merits of these claims, however, because her petition does not fulfill the stringent requirements of 28 U.S.C. Section 2254(b)(2)(B) and the district court consequently erred in purporting to grant a COA on her merits claims after it had rejected the successive

No. 16-11820

petition's compliance with the statutory prerequisites. We AFFIRM the dismissal of the successive petition.

## BACKGROUND

The evidence produced at trial was summarized by a Texas Court of Appeals on direct appeal:

> [Blackman] and the decedent, Lisa Davis, lived together in a lesbian relationship. One of the decedent's friends testified that the relationship was somewhat stormy and that, shortly before her death, the decedent wanted to end the relationship with appellant, although she was apprehensive about doing so.
>
> The couple lived in a second-floor apartment, accessible by an outdoor stairway to a balcony in front of the apartment. Appellant testified that, on Sunday evening, June 22, 1997, she left the apartment complex to go to a nearby convenience store, Quick Way. Upon returning, she realized she did not have her apartment key or her pass card to the apartment complex; she would have to ring the buzzer to be let into the complex. She went to the entryway of the apartment complex and, while she was standing on the sidewalk before going upstairs, she saw the decedent's feet lying on the balcony in front of their apartment. The apartment door was open, and the body was lying partially inside the apartment and partially outside. Decedent had been shot. Appellant called the decedent's name, and eventually touched the decedent, but the decedent did not respond. Appellant pulled the decedent's body inside their apartment. In doing so, she moved the decedent's feet to the side, to get them inside the apartment. She then shut the door and dialed 911. As a result of dragging the decedent's body inside the apartment complex, she got blood on her socks and shoes.
>
> Cathy Harding, a Dallas police detective, searched appellant in the homicide office at police headquarters because the only officers called to the crime scene were male; it was against department policy to have a male officer search a female suspect. Harding found blood on the soles of appellant's socks. Appellant told Harding that she had not taken her shoes off that evening.

2

No. 16-11820

When Daniel Krieter, a Dallas police investigator, arrived at the murder scene, appellant asked him if he remembered her from an incident that had occurred about a year earlier. Appellant had been shot by a gun, a .25 caliber Lorcin, that she owned. When the police closed their investigation into that incident, appellant reclaimed the gun from the department's property room. Appellant testified at trial that the gun was stolen some two months after she had reclaimed it in August 1995. She did not report it as stolen, however, because it was not registered. Appellant consistently denied that she had a gun on the night of the murder.

No gun was found; however, Krieter's search of the apartment revealed some spent shell casings on the floor and some live shell casings in a bureau drawer. The casings were .25 caliber and would fit a Lorcin. Appellant and the decedent had moved into the apartment only some thirty days before the decedent's death. Appellant explained that she moved in such haste she did not have time to throw out the live shell casings so she simply moved them.

Robert L. Ermatinger, a Dallas police homicide investigator, questioned appellant at the scene. Appellant told him she had gone to "the store" when the shooting occurred, although she could not say which store. When pressed, appellant said she realized while en route to the store she had forgotten her gate key and returned to the complex rather than going on to the store. When Ermatinger asked appellant at the scene if "they were a couple," that is, whether appellant and the decedent had a lesbian relationship, appellant said "they were not."

Finally, Cherissa Adams, a neighbor who lived on the first floor, testified that, on the evening of June 22, 1997, she heard a loud noise that sounded like gunfire. She looked out her window and saw a lifeless body. A young, thin girl was trying to move the body. The body's upper portion was inside an apartment. After Adams called 911, she returned to the window and continued to look out. The person who had moved the body locked the door and went downstairs. When the person looked in Adams's direction, Adams closed the blinds and moved away from the window. Adams had never seen the person before that evening and never saw her again. Adams was not able to identify appellant in court;

3

## No. 16-11820

at 11:35 p.m. on the night of the shooting, however, Adams did identify appellant in a photographic lineup.

*Blackman v. State*, No. 05-98-01750-CR, 2000 WL 5677985 (Tex. App.—Dallas May 8, 2000). Detective Lynette Harrison also testified at the trial. Harrison testified that Adams first chose Blackman's photograph from the photographic line up, and she affirmed that Adams did not "change her mind in any way" once she had identified Blackman.

Blackman was tried and convicted of murder. She was sentenced to life imprisonment. Her conviction was affirmed on appeal. The Texas Court of Criminal Appeals ("TCCA") also denied her petition for discretionary review. In 2002, Blackman filed her first state habeas petition, which was denied. She filed two federal habeas applications in 2003 and 2004, which were denied as untimely. She filed another state habeas application in 2006, which was dismissed as successive.

Blackman's mother hired new counsel, Craig Jett, in 2008. On August 27, 2009, Jett reviewed the Dallas District Attorney's Office's file on Blackman.[1] Jett found a prosecutor's note indicating that Adams had initially picked somebody else in the photographic lineup before changing her mind and identifying Blackman. Months later, in mid-2010, Jett sought out Blackman's previous counsel and determined that trial counsel, appellate counsel and writ counsel had been unaware of this evidence. Over a year later, in 2011, the District Attorney provided Jett with a recording of Adams's call to 911 the day of the murder. Adams stated in the 911 call that she saw a man lying in the doorway and a black man push him inside the apartment and close the door.

On December 17, 2010, Blackman filed another state habeas corpus petition alleging that the State failed to disclose the allegedly material

---

[1] The District Attorney's Office instituted a formal open file policy for writs in 2008.

No. 16-11820

exculpatory evidence in violation of *Brady* and presented false or misleading testimony in violation of *Giglio* and *Napue*.  The *Giglio/Napue* claim was based on the inconsistency between Detective Harrison's trial testimony that Adams had positively identified Blackman in the lineup and the prosecutor's note indicating hesitation.  The state trial court held, after a hearing, that because of the discovery of this additional evidence, Petitioner was entitled to a new trial.  The TCCA disagreed, concluded that the evidence was not material, and denied relief.  *Ex parte Blackman*, No. WR-52,123-03, 2012 WL 4834113 (Tex. Crim. App. Oct. 10, 2012).

Blackman, acting pro se, then filed her third federal habeas petition on May 4, 2013.  The district court transferred the case to this court to determine whether Blackman could file this successive habeas application.  This court granted permission to file the successive application because Blackman had made a prima facie showing that she could satisfy the requirements of 28 U.S.C. § 2244(b)(2)(B)(i) and (ii).

Back in the district court, the state moved to dismiss Blackman's petition as time-barred pursuant to Section 2244(d)(1)(D).  The district court accepted the magistrate judge's recommendation to deny this motion.  Subsequently, the magistrate judge considered whether the petition met the requirements of Section 2244(b)(2)(B) for a successive petition.  His recommendation concluded, under Section 2244(b)(2)(B)(i), that the factual predicate for her claims could not have been discovered earlier by exercising due diligence, but that the application must be dismissed for failing to satisfy Section 2244(b)(2)(B)(ii).  The judge considered Blackman's argument that if the two critical pieces of impeachment information about Adams been timely disclosed, Blackman would not have testified at trial.  The magistrate judge's opinion responded as follows:

5

No. 16-11820

> Even had Blackman not testified and her counsel impeached Ms. Adams's identification testimony, and even if the jury had heard that Ms. Adams first believed that she saw a black male move the decedent into the apartment and that Ms. Adams did not identify Blackman initially from the photographic array, two police officers testified that Blackman told them that she had moved decedent into the apartment upon discovering her. Blackman does not advance (and there is no evidence to support) a theory that an unidentified black male moved the body into – and then out of – the apartment prior to Blackman's coming home to discover the decedent lying outside the apartment.

The judge also rejected the contentions that one of those officers, Detective Ermatinger, who testified on rebuttal, would not have testified if Blackman herself had not taken the stand, and that Blackman's trial counsel, given access to the withheld evidence, would have successfully moved to suppress Blackman's statements. Blackman, in sum, had failed to establish by clear and convincing evidence that but for the prosecution's withholding evidence and procuring false testimony, no reasonable factfinder would have returned a guilty verdict. Notwithstanding these conclusions, the magistrate judge recommended granting a certificate of appealability ("COA") on Blackman's *Brady* and *Giglio/Napue* claims.

The district court affirmed the magistrate judge's findings in all but one particular. The court did not accept the magistrate judge's assumption that Detective Ermatinger's rebuttal testimony would have been offered even if Blackman had not testified. But the district court accepted the other findings and the ultimate conclusion that Blackman failed to meet the requirements of Section 2244(b)(2)(B)(ii). Like the magistrate judge, the district court dismissed Blackman's application for lack of jurisdiction but also granted a COA on the merits of her *Brady* and *Giglio/Napue* claims.

Blackman has appealed.

6

## STANDARD OF REVIEW AND APPLICABLE LAW

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court." *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001) (citation omitted). We review a district court's determination that it does not have jurisdiction *de novo*. *Leal Garcia v. Quarterman*, 573 F.3d 214, 217 (5th Cir. 2009).

This court has jurisdiction to rule on the judgment of the district court based on the issuance, by the district court or this court, of a Certificate of Appealability (COA). 28 U.S.C. § 2253(c)(1). A COA is required to specify the issue or issues on which "there is a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) and (3); *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595 (2000).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") states that second or successive habeas applications must be dismissed unless they fall into one of two exceptions. 28 U.S.C. § 2244(b)(2)(B). The exception at issue in this case requires the applicant to show:

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

This section is jurisdictional in nature. *Panetti v. Quarterman*, 551 U.S. 930, 942, 127 S. Ct. 2842, 2852 (2007).

No. 16-11820

## APPELLATE JURISDICTION

What might have been a relatively straightforward appeal concerning the difficult requirements for filing a successive federal habeas petition has been confused by the district court's erroneous partial grant of COA and some convoluted arguments of the state. Rather than parse the complex procedural history at play, we will cut to the chase. The district court was not authorized to grant COA on the merits of Blackman's claims while also determining that her petition ultimately failed to meet the statutory prerequisites for a successive try at federal habeas relief. The Supreme Court has plainly stated that "[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim," a COA requires a showing "at least," that reasonable jurists could debate both the procedural ruling and whether the petition states a valid constitutional claim. *Slack,* 529 U.S. at 484, 120 S. Ct. at 1604. If the petition is procedurally barred, no further inquiry should be made and no appeal is warranted. *Id.* Put otherwise, Blackman would have been able to secure a COA on the merits of her claims only if the district court had also determined that reasonable jurists could debate the court's procedural ruling. *Id.* The district court got the order of procedure exactly backward.[2] Blackman's counsel recognized the error and persuaded this court to expand the COA in an order dated May 22, 2018, pursuant to which we have jurisdiction to rule on whether the district court's

---

[2] The district court clearly erred to the extent that it apparently accepted the magistrate judge's reasoning that in some circuits, *Brady* and related claims may not be subject to the strictures of Section 2244(b)(2), and hence the *Brady* claims may be independently appealed. As is explained more fully in the next section, this court holds to the contrary. *Leal Garcia v. Quarterman,* 573 F.3d 214, 220-22 (5th Cir. 2009); *Johnson v. Dretke,* 442 F.3d 901, 906-12 (5th Cir. 2006). Thus, a petitioner asserting a newly discovered *Brady* claim in a successive habeas case must pass the tests of Section 2244(b)(2) before a federal court may reach the merits.

No. 16-11820

procedural decision comported with the threshold requirements of Section 2244 (b)(2)(B).

## DISCUSSION

Blackman's brief first assumes that Section 2244(b)(2)(B) controls and contends that the district court erred in dismissing her petition for failure to demonstrate that, but for the state's withheld or perjured evidence, no reasonable factfinder would have found her guilty of murder. 28 U.S.C. Section 2244(b)(2)(B)(ii). More broadly, she argues that her *Brady* and *Giglio/Napue* claims are not second or successive and that this court has not yet resolved whether *Brady* claims are subject to the requirements of Section 2244(b)(2)(B).[3]

To begin, Blackman's argument that these claims do not fit or are in tension with AEDPA's requirements for successive petitions under Section 2244(b)(2)(B) has been rejected conclusively by this court. *In re Davila*, 888 F.3d 179, 184-87 (5th Cir. 2018), applied this statutory provision to a petitioner's *Brady* claims and held that the requirements for pursuing a successive petition were not fulfilled. In *Leal Garcia*, this court emphasized that "[s]ection 2244(b)(2)(B)(i) states that claims based on a *factual* predicate not previously discoverable are successive." 573 F.3d at 221 (emphasis in original). Blackman's *Brady* and *Giglio/Napue* claims rely on precisely such previously undiscovered facts and are therefore within the purview of the statutory language. Even more pointedly, this court refused to "collapse AEDPA's due diligence requirement [section 2244(b)(2)(B)(i)] into the

---

[3] Responding to Blackman's brief, the state rejects her successive petition arguments and urges in addition that at least one of her claims was not pursued within the one-year AEDPA statute of limitations. 28 U.S.C. Section 2244(d)(1)(D). Because Blackman's petition must be dismissed pursuant to Section 2244(b)(2)(B), we need not discuss the district court's conclusion that Blackman's successive claim was timely under the statute of limitations.

*Brady* duty…" and concluded that the statutory requirements for a successive petition must be considered prior to evaluation of the merits of the petitioner's *Brady* claim.  *Johnson v. Dretke,* 442 F.3d 901, 906-911 (5th Cir. 2006).  We are bound by these clear precedents and proceed to examine whether Blackman's claims satisfy the statutory requirements.

### 1. Section 2244(b)(2)(B)(i) Due Diligence

The district court determined that Blackman met the due diligence requirement of Section 2244(b)(2)(B)(i).  We disagree, at least in part, based on *Johnson v. Dretke, supra.*  In that case, the petitioner, Johnson, alleged in a successive petition that his accomplice signed a stipulation confessing to the murder Johnson was accused of committing.  Johnson further alleged that, in violation of *Brady,* his accomplice testified at trial that Johnson committed the murder.  Months before his conviction, however, Johnson was aware of the accomplice's indictment, guilty plea, and the submission of a stipulation and plea agreement.  *Id.* at 904, 906, 908-09.  This court held that Johnson could not meet the due diligence requirement of Section 2244(b)(2)(B)(i) because a reasonable attorney would have been put on notice of the existence of the accomplice's stipulation.  *Id.* at 908-09. Together with the reasonable attorney standard, *Johnson* holds that under this provision, due diligence is measured objectively, not by the subjective diligence of the petitioner.  *Id.* at 909-10

In this case, Adams's call to 911 was discussed at the trial by Adams and the firefighter/paramedic who responded to the scene.  A reasonable attorney would have been put on notice at that time that a recording or transcript of the call may exist.  Not one of Blackman's attorneys inquired as to the existence of a transcript until years after the trial.  As in the *Johnson* case, they plainly failed to meet the due diligence requirement for at least this aspect of her

claims.    Even assuming however, that Blackman satisfied the diligence requirement, her claims fail under Section 2244(b)(2)(B)(ii).

## 2. Section 2244(b)(2)(B)(ii) Innocence Requirement

The district court held that Blackman's claims did not satisfy the requirement of Section 2244(b)(2)(B)(ii) because, taken together with the proof adduced at trial, the newly discovered evidence does not show "by clear and convincing evidence" that, but for the prosecution's misconduct, "no reasonable factfinder would have found her guilty" of murder.  We agree.  To reiterate, all of Blackman's claims rely on (1) the 911 call in which Adams stated that she saw a man lying on the ground and a man drag the body inside the apartment, (2) the prosecutor's note stating that Adams initially picked out another person from the photographic lineup before picking Blackman, and (3) Detective Harrison's testimony that Adams did not change her mind during the photographic lineup.

But the fact that Adams was unable to identify Blackman at the defense table in court seriously undermines her theory.  She was thus a dubious eyewitness even without additional impeachment evidence.  Concededly, the new evidence casts a more negative light on Adams's prior identification of Blackman in the photographic lineup, but this is no more than cumulative impeachment.  On the other hand, the state produced significant evidence corroborating Adams's identification and the substance of her 911 call.  Officer Canales testified on direct examination that Blackman acknowledged at the scene of the crime that she had moved the body inside.  Officer Harding also testified that Blackman said she moved the body back into their apartment.  Blackman's contemporaneous statements placed her at the scene and moving the body of the deceased.

No. 16-11820

Significant additional evidence supports that a reasonable juror could find Blackman guilty beyond a reasonable doubt.  Most provocatively, the soles of her socks had blood on them even though she denied to Detective Harding that she had taken her shoes off that evening. Detective Krieter testified that the bullets and shell casings from the fatal shots found in the apartment would fit a .25 caliber Lorcin, a pistol that Blackman admitted having owned at one point.  Live shell casings and a live bullet were found in two drawers in her bedroom, although Blackman claimed she no longer had the pistol (which was never found by the investigators).  Additionally, Davis's friend testified that Davis and Blackman had at least one violent argument, and about a week before her death Davis stated to her friend that she wanted out of her relationship with Blackman.  The totality of the evidence does not prove clearly and convincingly, even with the additional impeachment of Adams's identification, that a reasonable jury would have been swayed to acquit Blackman.  We concur with the district court that because Blackman did not surmount the standard of Section 2244(b)(2)(B)(ii), the court was required to dismiss for lack of jurisdiction.

Accordingly, we AFFIRM the judgment of the district court dismissing Blackman's successive habeas petition.

12